JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY,
Plaintiff,

v.

Barbara L. AUSTIN, Defendant.

No. 94–CV–917.

United States District Court,
N.D. New York.

Feb. 8, 1996.

Whiteman, Osterman, & Hanna, Albany, NY (Beth A. Bourassa, of counsel), Stevens & Lee, Wayne, PA (William J. Payne, of counsel), for Plaintiff.

Gleason, Dunn, Walsh & O'Shea, Albany, NY (Ronald G. Dunn, Michael P. Ravalli, of counsel), for Defendant.

### MEMORANDUM, DECISION AND ORDER

HURD, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff John Hancock Mutual Life Insurance Company ("John Hancock") brings an action against defendant under Section 301(a) of the Labor Management Relations Act, 29

U.S.C. § 185(a) on one federal cause of action, and two state causes of action. First, plaintiff claims that the defendant Barbara L. Austin ("Austin") violated a Covenant Not to Compete within a Collective Bargaining Agreement. Second, plaintiff brings an action under New York law for breach of contract. Finally, plaintiff asserts that defendant tortiously interfered with their business resulting in direct financial loss which is also recoverable under New York law. Defendant has moved for summary judgment under Fed.R.Civ.P. 56 on the basis that the Covenant not to Compete is unenforceable. Oral argument was heard in Utica, New York, on January 18, 1996. The court reserved decision.

## II. *FACTS*

In 1978, Austin went to work for John Hancock selling insurance. Prior to her job with John Hancock, Austin had no experience as an insurance salesperson. Austin worked for the John Hancock branch in Glenville, New York, and commuted from her home located near Fort Plain, New York. She worked for John Hancock for the next fifteen years. In 1993, she was informed that the John Hancock branch in Glenville was closing and the office would be consolidated with the larger branch in Albany, New York. This change of location would have added substantial time and distance to Austin's daily commute to work. On July 22, 1993, Austin informed her manager that she was going to resign. Upon receiving this information, the manager told her that it was not necessary for her to return to work. On July 26, 1993, Austin began working for the Prudential Life Insurance Company ("Prudential") which has an office in Fort Plain, New York.

Prior to her change of employment, Austin's labor union entered into a Collective Bargaining Agreement ("Agreement") with John Hancock that contained a Covenant Not to Compete ("Covenant"). The Covenant reads as follows:

Upon a Marketing Representative's termination or resignation, the Marketing Representative shall not directly or indirectly engage in any of the following conduct nor aid or abet others to do so:

1. Retain in his or her possession any Company records, files, manuals, supplies, material and forms nor photostat or otherwise copy same.

\*　\*　\*　\*　\*　\*

3. For a period of two years following such termination, contact any Company policyholder or Annuity Contract holder within the confines of the District where the Marketing Representative was last employed for the purpose of inducing or attempting to induce such policyholder or Contract holder to cancel, lapse, or fail to renew such policyholder's policy(ies) or Annuity Contract(s) with the Company.

NOTE: For purposes of this Article, the term "Annuity Contract" shall include Individual Variable Annuity Contracts.

Violation of any of the above may be enjoined by any legal means available to the Company. The party who prevails in such litigation shall be entitled recover from the other party all costs and expenses incurred in connection with such litigation including all attorney's fees.

\*　\*　\*　\*　\*　\*

Collective Bargaining Agreement, Article XXIV Covenant Not to Compete.

Upon beginning her new job, Austin sold several new Prudential policies to former customers who canceled their John Hancock policies. Also, Austin allegedly violated Article XVI section 12 of the Agreement which requires former employees to return their John Hancock records upon leaving.[1] She did not turn over such records to the plaintiff, and John Hancock maintains that this information was confidential and constituted trade secrets.

---

1. Article XVI of the Agreement states that the Marketing Representative "[a]grees that all books, records, and supplies furnished to the Marketing Representative by the Company shall remain the property of the Company; and upon termination of the Marketing Representative's employment will hand over said books, records, and supplies to a proper representative of the company."

## III.  DISCUSSION

### A.  Summary Judgment Standard

■ Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir.1991). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983).

■ When the moving party has met the burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. at 1356. At that point, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby Inc.*, 477 U.S. at 250, 106 S.Ct. at 2511; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356. To withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–249, 106 S.Ct. at 2510–11; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356. Thus, summary judgment is proper where there is "little or no evidence . . . in support of the non-moving party's case."

*Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

### B.  Factual Dispute

As detailed above, when considering a motion for summary judgment, this court must consider the facts in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. at 1355–56. By her own admission, Austin has violated Article XVI section 12 of the Agreement because she failed to turn her records over to an appropriate representative of John Hancock. (Austin Dep. at 57–59.) Instead, Austin testified that she threw the records away because she did not know she had to return them. *Id.*

The questions of fact remaining are straightforward: Did Austin violate paragraphs 1 and 3 of Article XXIV of the Agreement? In order to view the facts in favor of the nonmoving party, the court will continue this analysis under the premise that Austin did keep the John Hancock records in her possession and did not discard them. Further, the court will assume that Austin used those records to contact former clients and encouraged them to cancel their John Hancock policies.

With these assumptions, the only possible way that the defendant could prevail on this summary judgment motion is if the paragraphs within Article XXIV are unenforceable. Therefore, the court must determine the enforceability of these provisions.

### C.  Choice of Law

■ It is undisputed that this court has jurisdiction to hear this case under Section 301(a) of the Labor Management Relations Act which has been codified as 29 U.S.C. § 185(a).[2] Although Austin's labor union is not a party, Section 301(a) has been interpreted to apply to individuals being sued under a collective bargaining agreement en-

---

**2.** The relevant part of the Labor Management Relations Act provides:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce is defined in this chapter, or between

any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
29 U.S.C. § 185(a).

162

tered into by a party defendant's union. *See John Hancock Mut. Life Ins. Co. v. Schwertmann,* 627 F.Supp. 143 (E.D.Mo., 1985).

Plaintiff argues that federal law and precedent should apply relying on the decisions of the Supreme Court as well as other federal courts. Further, plaintiff cites Federal District Court cases which have analyzed the clause at issue here and have ruled in favor of John Hancock. Defendant argues that the federal courts have never addressed the issue of Covenants Not to Compete. It is Austin's contention that because no body of federal law exists regarding this subject, New York State law should apply. According to defendant, New York State law prohibits agreements such as the Covenant in question here.

### 1. *Federal Law and Section 301(a)*

The Supreme Court dealt with Section 301(a) in *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). In that case, the Supreme Court held that in § 301 cases, the common law to be applied is "federal law, which the courts must fashion from the policy of our national labor laws.... But state law, if compatible with the purpose of Section 301 may be resorted to in order to find the rule that will best effectuate the federal policy." *Id.* at 456, 77 S.Ct. at 918. It was the aim of the Court to establish a uniform body of law that would not be subject to the variations of state law. This idea was supported further when the Supreme Court stated that in dealing with cases involving collective bargaining agreements, "incompatible doctrines of local law must give way to principles of federal labor law." *Teamsters Local v. Lucas Flour Co.,* 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962). The Court further dis-

cussed the rationale for the desire for uniformity in the interpretation of labor contracts: "The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Id.*

### 2. *Federal Law and Covenants Not to Compete*

■ The next question is whether or not a body of federal law exists on the specific subject of Covenants Not to Compete. Although John Hancock contends that federal common law does exist, the cases provided and subsequent research cannot support this argument. Federal courts have considered restrictive covenants in diversity cases where the court was acting as a state court, including a New York State court.[3] However, after thorough research, the court has not discovered cases which address Covenants Not to Compete within Collective Bargaining Agreements governed by § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185. All of the cases cited by John Hancock involve decisions regarding preliminary injunctions. None of these cases cite relevant case law or statutes.[4]

Even though there appears to be no body of federal law on the subject, this court is guided by the principles in *Lucas Flour.* In essence, the main concern of the Supreme Court was to develop, if one did not already exist, federal common law that could be applied uniformly versus a body of law that varied from state to state. *Lucas Flour,* 369 U.S. at 102, 82 S.Ct. at 576. That leaves this court in the position of establishing federal common law that can be applied not only in New York, but other states as well. In order

---

**3.** *See A.L. Williams & Assocs. v. Stelk,* 960 F.2d 942 (11th Cir.1992); *Overholt Crop Ins. Serv. Co. v. Travis,* 941 F.2d 1361 (8th Cir.1991); *USAchem, Inc. v. Goldstein,* 512 F.2d 163 (2d Cir. 1975); *Bradford v. New York Times Company,* 501 F.2d 51 (2d Cir.1974); *MedX Inc. v. Ranger,* 780 F.Supp. 398 (E.D.La.1991); *Prudential Ins. Co. of America v. Baum,* 629 F.Supp. 466 (N.D.Ga.1986); *Marketing, Research and Counselors, Inc. v. Booth,* 601 F.Supp. 615 (N.D.Ga. 1985) among others.

**4.** The cases cited by plaintiff include: *John Hancock Ins. Co. v. Root,* 131 L.R.R.M. 2125 (D.C.R.I.1987); *John Hancock Ins. Co. v. Haupt,* 119 L.R.R.M. 3254 (E.D.Va.1985); *John Hancock Ins. Co. v. Bloodworth,* 119 L.R.R.M. 3250 (N.D.Fla.1985); Skinner, J., *John Hancock Ins. Co. v. McCarthy,* Civ. Action No. 86–1619–S (1987). None of these cases cite relevant case law or statutes and appear to be opinions which were provided by the judges directly from the bench.

to accomplish this, the court is guided by relevant New York law.[5]  *Id.*

### D.  New York Law on Covenants Not to Compete

When analyzing a restrictive covenant, New York courts examine the facts and circumstances surrounding the particular case.  " 'Courts must respond to each case as it presents itself, and often times . . . must resolve seemingly divergent considerations of public policy.' "  *Greenwich Co. v. Barrie House,* 91 A.D.2d 398, 400–01, 459 N.Y.S.2d 454 (2d Dep't 1983) (citing *Matter of Sprinzen,* 46 N.Y.2d 623, 628–29, 415 N.Y.S.2d 974, 389 N.E.2d 456 (1979)).  The courts first consider the "reasonableness" of the restrictive covenant as applied to the facts of the case being considered.  *Reed, Roberts Assocs., Inc. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976).  This reasonableness test will vary depending upon the type of restrictive covenant in question.  *Id.*  "For example, where a business is sold, anticompetition covenants will be enforceable if reasonable in time, scope and extent. . . .  However, where an anticompetition covenant given by an employee to his employer is involved, a stricter standard of reasonableness will be applied."  *Id.*

Rigid employer-employee restrictive covenants are generally unenforceable in New York.  "It is well established that restrictive covenants that tend to prevent an employee from pursuing a similar vocation upon termination or retirement from employment are disfavored by the law."  *Briskin v. All Seasons Servs., Inc.,* 206 A.D.2d 906, 906, 615 N.Y.S.2d 166 (4th Dep't 1994).  Furthermore, covenants which are so broad as to "baldly restrain competition" will not be enforced.  *Columbia Ribbon v. A–1–A Corp.,* 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977).

However, it has been recognized that a balance must be met.  This balance is between protecting an individual's livelihood versus protecting a company's interest against competition by former employees who utilize private information gathered from their prior position.  *Reed,* 40 N.Y.2d at 308, 386 N.Y.S.2d 677, 353 N.E.2d 590.  "Of course, the courts must also recognize the legitimate interest an employer has in safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy."  *Id.*

*Reed* sets forth a two part test.  First, a Covenant Not to Compete that limits a former employee's ability to work in the same occupation will be enforced only if "it is reasonable in time and area, necessary to protect the employer's legitimate interest, not harmful to the general public and not unreasonably burdensome to the employee."  *Id.* at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590.  Second, even if the covenant meets the first test, it will only be enforced "to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information."  *Id.* at 308, 386 N.Y.S.2d 677, 353 N.E.2d 590 (citations omitted);  *See also Purchasing Assoc. v. Weitz,* 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963) (A restrictive covenant will be enforced only to the "extent necessary to prevent the employee's use or disclosure of his former employer's trade secrets, processes or formulae or his solicitation of, or disclosure of any information concerning the other's customers.") (citations omitted);  *Briskin,* 206 A.D.2d at 906, 615 N.Y.S.2d 166;  *Business Intelligence Servs., Inc. v. Hudson,* 580 F.Supp. 1068, 1071 (S.D.N.Y.1984).

---

5.  In choosing to look to New York law, the court is guided by the fact that although the law on restrictive covenants in the employment context is not perfectly uniform across the states, New York uses the universal concept of "reasonableness" in analyzing such covenants.  Brett D. Pynnonen, *Ohio and Michigan Law on Postemployment Covenants Not to Compete,* 55 Ohio St. L.J. 215 "Most states, either through common law or statutory decree, have decided that the best way to resolve the inherent policy conflicts within covenants not to compete is to judge the covenant according to the doctrine of 'reasonableness.' "  *Id.* at 217 (citations omitted).  The court is confident that by relying upon New York law and the concept of "reasonableness," the goals of both § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185 and the Supreme Court in *Lucas Flour* will be achieved.

### E. *The Above Principles as Applied to the Collective Bargaining Agreement*

Defendant would have this court believe that the Covenant Not to Compete in question is of the sort that would be unenforceable under New York law. This court cannot agree. The Collective Bargaining Agreement contains an extremely lenient restrictive covenant that is enforceable under *Reed.*

Article XVI of the Agreement is an ordinary provision which merely requires the return of records and reports held by former employees. Paragraph 1 of Article XXIV prevents a former employee from competing by utilizing the records and reports of the company which has developed them.[6] Thus, this paragraph is not a "restrictive covenant that tend[s] to prevent an employee from pursuing a similar vocation...." *Briskin*, 206 A.D.2d at 906, 615 N.Y.S.2d 166. Paragraph 3 of Article XXIV does not seek to prohibit the former employee from selling insurance.[7] In fact, the paragraph doesn't even forbid former employees from soliciting the business of former clients. Rather, its sole aim is to prevent former employees from encouraging these customers to cancel, lapse, or fail to renew their existing John Hancock policies. This is hardly a rigid covenant of the sort that the New York courts disdain. In this regard, it is perfectly "reasonable" under *Reed. See* 40 N.Y.2d at 308, 386 N.Y.S.2d 677, 353 N.E.2d 590. Other courts have found more restrictive schemes to be reasonable under New York law. In *Ecolab Inc. v. K.P. Laundry Machin.*, 656 F.Supp. 894, 899 (S.D.N.Y.1987), the court found that a one year ban on any solicitation of former clients was acceptable because a wealth of potential customers existed. In *Bausch & Lomb, Inc. v. Smith*, 630 F.Supp. 262, 266 (W.D.N.Y.1986), a two year ban from seeking employment with a competitor that deals with similar products to which the employee was exposed was found to be reasonable.

Next, the Covenant only applies to the geographical area in which that former employee was located and it expires after two years. In that regard, it is reasonably limited in geographical scope and time. *See Reed,* 40 N.Y.2d at 308, 386 N.Y.S.2d 677, 353 N.E.2d 590. Further, it does not unduly burden the former employee since that person is permitted to find new insurance customers and even sell different policies to former clients. *Id.* Moreover, it is not harmful to the public. *Id.* All customers are allowed to buy insurance from whomever they please, including from former John Hancock representatives. These clients could even replace their existing John Hancock policies assuming they do so on their on their own initiative. *Id.* Thus, the first part of the *Reed* test is met.

The second prong under *Reed* which requires the protection of the employer's "trade secrets or confidential customer information" is also satisfied. *Id.* Austin argues that the information she may have relied upon is not a "trade secret." This, she says, is because the names of the customers whom she contacted are readily available in the phone book. This may be true. Lists containing only customer names do not constitute a trade secret or "confidential customer information" in the insurance field. *Reidman Agency, Inc. v. Musnicki*, 79 A.D.2d 1094, 1094, 435 N.Y.S.2d 837 (4th Dep't 1981). However, the detailed information needed to provide insurance to these former customers is not in the phone book. Such detailed information was available to Austin in the confidential customer lists and papers

---

**6.** To reiterate, Paragraph 1 of Article XXIV of the Agreement's Covenant Not to Compete provides that a Marketing Representative shall not: "1. Retain in his or her possession any Company records, files, manuals, supplies, material and forms nor photostat or otherwise copy same."

**7.** Again, to reiterate, Paragraph 3 of Article XXIV of the Agreement's Covenant Not to Compete provides that a Marketing Representative shall not:

**3.** For a period of two years following such termination, contact any Company policyholder or Annuity Contract holder within the confines of the District where the Marketing Representative was last employed for the purpose of inducing or attempting to induce such policyholder or Contract holder to cancel, lapse, or fail to renew such policyholder's policy(ies) or Annuity Contract(s) with the Company.

that were not returned to John Hancock. Although this information may not rise to the level of a "trade secret," it certainly does constitute "confidential customer information." *See Reed,* 40 N.Y.2d at 308, 386 N.Y.S.2d 677, 353 N.E.2d 590. The papers and records in question were not mere customer lists. In addition to customer names, these papers contained information involving customer coverage, premium amounts, cash values, and loans against existing policies. (Neal F. Smith Aff.) This rises to the level of "confidential customer information" under *Reed. Id.; see Carpenter & Hughes v. De Joseph,* 10 N.Y.2d 925, 926, 224 N.Y.S.2d 9, 179 N.E.2d 854 (1961); *Lepel High Frequency Lab., Inc. v. Capita,* 278 N.Y. 661, 16 N.E.2d 392 (1938). Therefore, the second prong of the test is also fulfilled.

Austin attempts to analogize her case with certain New York Appellate Division cases. The court remains unconvinced. *Levine v. Bochner,* 132 A.D.2d 532, 517 N.Y.S.2d 270 (2d Dep't 1987), involved an insurance salesman who was not accused of keeping the records of his former employer. Rather, he claimed to have memorized the names and detailed insurance needs of the 26 customers in question. *Id.* at 533, 517 N.Y.S.2d 270. In the case at bar, there is a factual question remaining as to whether or not Austin relied upon the John Hancock records that contained confidential customer information. *Cool Insuring Agency v. Rogers,* 125 A.D.2d 758, 509 N.Y.S.2d 180 (3d Dep't 1986) was an appeal against a temporary injunction. The case involved several restrictive covenants that were much more strict than those in the case at bar, and there was no issue surrounding the improper use of the former employer's confidential customer information. *Id.* at 758, 509 N.Y.S.2d at 181–82.

## IV. CONCLUSION

Issues of fact do remain. First, did Austin retain the records of John Hancock in violation of Article XXIV(1)? Second, did Austin contact former clients and encourage them to lapse, cancel, or fail to renew existing John Hancock policies in violation Article XXIV(3)? Third, did Austin's actions constitute a breach of contract and/or tortious in-

terference with John Hancock's business? Finally, if Austin is found to have violated XXIV(1), (3), breached the contract, and/or tortiously interfered with John Hancock's business, what, if any, damages were suffered?

WHEREFORE, it is

ORDERED that:

1. New York law is applicable;

2. The Covenant is enforceable;

3. Defendant's motion for summary judgment is DENIED; and

4. The trial of this action shall commence on Monday, March 11, 1996, at 10:00 a.m., preceded by a final pretrial conference at 9:30 a.m. at the United States Court House in Utica, New York. The parties are hereby directed to file, on or before March 4, 1996, proposed findings of fact and conclusions of law, exhibit lists, stipulations of material facts not in dispute, and witness lists with a brief statement as to what each witness will testify.